# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Deborah E. O'Shell,  :
              Petitioner  :
                :
        v.  : No. 1200 C.D. 2015
            : Submitted: February 26, 2016
Pennsylvania Game Commission,  :
              Respondent  :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge


<u>OPINION NOT REPORTED</u>


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI         FILED: March 21, 2016


        Deborah E. O'Shell (Permittee) petitions for review from an order of the Pennsylvania Game Commission (Game Commission) recalling her special permits for a period of five years. For the reasons that follow, we affirm.


## I.

        Permittee founded the Blair County Wildlife Rehabilitation Center (Center) over 20 years ago. In order to run the Center, Permittee was issued four special permits by the Game Commission, namely:


-     A Wildlife Rehabilitation permit authorizing her to possess and to offer temporary care to injured, diseased, and displaced wildlife, and to release healthy wildlife to appropriate habitats in the wild.

- An Educational Exhibit of Wildlife permit (Exhibit permit) authorizing her to conduct educational programs or exhibits of non-releasable wildlife.

- A Salvage permit, authorizing her to salvage birds and animals protected under the Game and Wildlife Code (Code)[1] for exhibition in public museums, scientific study, or educational instruction.

- A Wildlife Menagerie permit (Menagerie permit), authorizing her to keep wild birds and animals in captivity for the purpose of exhibition, with or without charge. The species listed on the Menagerie permit are albino skunk, ape, capuchin monkey, spider monkey, two guenon monkeys, two ring tailed lemurs, three flying squirrels, two hedgehogs, kinkajou, raccoon, and fox.

Permittee was also issued permits by the United States Department of the Interior, Fish & Wildlife Service (Department of the Interior) pursuant to the Migratory Bird Treaty Act,[2] including a Migratory Bird Rehabilitation permit and a Special Purpose Possession permit.

The intent of the Game Commission's permits is to regulate activities relating to the possession, transfer, rehabilitation, release and care of certain protected species. *See* 34 Pa. C.S. §§2167, 2307, 2164 and 2908. It is unlawful for an individual to possess wildlife taken from a wild state within the Commonwealth unless the individual is lawfully operating under the authority of a permit. 58 Pa. Code §137.31. It is also unlawful for an individual to exercise any privileges

---

[1] Game and Wildlife Code, 34 Pa. C.S. §§101-2965.

[2] 16 U.S.C. §§703-707.

2

granted by a permit without first securing the required permit, to make false or misleading statements on any required reports, or to fail to keep accurate reports. 34 Pa. C.S. §2908.

In September 2012, the Game Commission received information that Permittee had unlawfully taken possession of a bald eagle the previous month. A Wildlife Conservation Officer (WCO) for the Game Commission, Albert Zellner (Zellner), conducted an investigation causing the Game Commission to suspend Permittee's Wildlife Rehabilitation permit pending further investigation into the alleged unlawful possession of the bald eagle. After further investigation, WCO Zellner filed a five-count criminal complaint against Permittee for the unlawful possession of the bald eagle, an endangered or threatened species. The Department of the Interior also filed a violation notice against Permittee for the unlawful possession of the bald eagle.

During the Game Commission's investigation into the unlawful possession of the bald eagle, WCO William Brehun (Brehun)[3] also obtained evidence that Permittee illegally transferred possession of a one-winged barred owl to a volunteer at the Center, David Stimer (Volunteer Stimer), for safe-keeping after the Department of the Interior denied renewal of her migratory bird permits.

---

[3] WCO Brehun's duties involve overseeing the compliance of entities and persons issued special permits in his assigned district, including Permittee and the Center.

In September 2013, Permittee came into possession of two hedgehogs without obtaining the required documentation and without adding the hedgehogs to her Menagerie permit. She notified WCO Brehun that she possessed the hedgehogs without first acquiring the appropriate permits. WCO Brehun issued her a notice of violation but allowed her to keep the hedgehogs in her possession. She subsequently amended the species she was allowed to keep under her Menagerie permit to include the hedgehogs. In February 2014, Permittee took possession of a monk parakeet without first securing the required permit. After she notified the Commission that she had the monk parakeet, WCO Brehun filed a citation under Section 2908(a)(1) of the Code[4] against her for the unlawful possession of the monk parakeet. On July 16, 2014, after a hearing before a Magisterial District Judge, Permittee was convicted of the unlawful possession of the monk parakeet. In response, Permittee has filed a summary conviction appeal in the Blair County Court of Common Pleas which is pending.

Regarding the state charges for unlawful possession of a bald eagle, in May 2014, the Blair County Court of Common Pleas placed Permittee in the

---

[4] Section 2908(a)(1) of the Code provides:

> (a) General rule.--Except as provided for in subsection (a.1), it is unlawful to:
>
> (1) Exercise any of the privileges granted by a permit issued under this title without first securing the required permit.

34 Pa. C.S. §2908(a)(1).

Accelerated Rehabilitation Disposition (ARD) program to serve a probationary period of 12 months.

In July 2014, an officer in a local police department informed WCO Brehun that Permittee was publically exhibiting birds at a Wal-Mart in Altoona. WCO Brehun went to the Wal-Mart and, after speaking with Permittee and others, determined that Permittee violated the Code because she could not produce a copy of her permits and was issued a warning.

As a result of those incidents, in August 2014, the Game Commission filed a petition to recall and/or deny renewal of Permittee's four special permits under Section 929 of the Code[5] because of Permittee's multiple violations and acts

---

[5] Section 929 of the Code states, in pertinent part:

> (a) General rule.--Except as otherwise provided in this title, any hunting or furtaking license, special license or permit or registration granted under the authority of this title may be denied, revoked or suspended by the commission when the holder of the license, permit or registration is convicted of an offense under this title or has acted contrary to the intent of the registration or permit, with each offense constituting a separate violation subject to separate revocation. The commission may refuse to grant to that person any permit or registration and may deny any privilege granted by these documents for a period not exceeding five years unless otherwise provided in this title.
>
> * * *
>
> (b) Regulations.--The commission may promulgate regulations specifying the procedures to be followed in denying, revoking or suspending any hunting and furtaking privileges, licenses, permits and registrations granted under the provisions of this title.

**(Footnote continued on next page…)**

of noncompliance which jeopardized the health and safety of the wildlife in her possession.

While that petition was pending, in October 2014, WCO Brehun scheduled a required, annual inspection of the Center with Permittee, and they mutually agreed that the inspection would occur on a specific day the following week.[6] However, when he went to the Center for the scheduled inspection, Permittee claimed to have forgotten about it.[7] WCO Brehun went ahead with the inspection and found the Center to be noncompliant and "filthy" and recommended disapproval for renewal or continuation of the permit.[8] He then issued Permittee a

---

**(continued…)**

34 Pa. C.S. §929.

[6] WCO Brehun testified that some permits require annual inspections while others require annual reports, and that depending on the type of facilities and permits, he visits facilities for annual inspections in making compliance determinations. He stated that the Wildlife Menagerie Permit and the Wildlife Rehabilitation permit require annual inspections, which are either announced, scheduled visits or surprise visits. He explained that during the inspection, the inspector assesses the health and welfare of the animals by inspecting, among other things, cage sizes, food, water and the environment.

[7] WCO Brehun stated that in performing an inspection, the officer looks to see whether the permittee has a copy of the permit available, that the cage sizes are adequate to the animal species, that food and water are present, that the enclosures and living quarters are kept in a clean and healthy condition, that the food is kept in sanitary conditions, and whether there is protection and shelter, among other considerations.

[8] In the report, WCO Brehun specifically noted:

> This inspection that occurred on 10/21/14 @ 1320 was scheduled a week prior to the inspection date. Cadet Edwards and myself showed up and caught Ms. O'Shell off guard as she forgot about the scheduled inspection. While doing our walk through we found

**(Footnote continued on next page…)**

notice of violation for the unsanitary conditions of the enclosures as well as Permittee's failure to post required signage.

## II.

## A.

At the hearing on the Commission's petition to recall and/or deny renewal of Permittee's special permits on the basis that she was convicted of an offense under the Code and/or has acted contrary to the intent of any of the permits she had been issued, WCO Brehun testified that in July 2008, Permittee was cited by the Department of the Interior for failing to comply with the record-keeping requirements of her federal permits under 50 C.F.R. §21.27, for which she was found guilty by the United States District Court for the Western District of Pennsylvania. As a result, in 2011, the Department of the Interior denied Permittee's renewal applications for her federal Special Purpose Possession permit and Migratory Bird Rehabilitation permit.

---

**(continued…)**

> the facility to be filthy. Most of the cages specifically the monkies [sic] were covered in feces in the amount that they appeared not to have been cleaned in an extended period of time. The food that was inside of the pens were [sic] laying within the feces. Half of the cages did not have species identification on and there was [sic] no signs present prohibiting the public from feeding the wildlife. Ms. O'Shell was given one week to be in compliance. An inspection is scheduled for 10/28/2014 @ 1700. [sic].

(Reproduced Record (R.R.) at 535a.)

With respect to the bald eagle, WCO Brehun testified that he received a call from two individuals alerting him that they found an injured bald eagle and dropped it off at the Center. WCO Brehun testified that WCO Zellner and the Department of the Interior's Special Agent Randy Cottrell (SA Cottrell) initiated this investigation, which he later joined. He stated that Permittee initially denied possessing the bald eagle, but, in a subsequent interview, admitted that the bald eagle was in the Center.

WCO Brehun further testified that he spoke with Volunteer Stimer and James Singler (Ex-husband Singler), Permittee's former husband, and that they provided written statements confirming that Permittee possessed the bald eagle.

WCO Brehun explained that Permittee was charged with possessing a bald eagle because at the time of the violation, the bald eagle was classified as a threatened and endangered species but is no longer classified as such in Pennsylvania because of its currently self-sustaining population.

Volunteer Stimer testified that he initially lied to investigators when he reported not observing a bald eagle in Permittee's possession. He stated that he then told investigators that he had seen a live bald eagle in a cage inside the Center.[9] Ex-husband Singler testified that in September 2012, Permittee informed

---

[9] Volunteer Stimer submitted a sworn affidavit, in which he attested:

> I was present at the facility on September 8, 2012, when Conservation Officers interviewed [Permittee] about the eagle. *When asked whether I had seen the eagle at the facility I lied and stated I had not. At some point after the Officer's visit [Permittee]*

**(Footnote continued on next page…)**

him of her possession of the bald eagle and admitted to misleading investigators by denying that she possessed it.[10] SA Cottrell testified that Permittee initially denied taking possession of the bald eagle but later admitted to possessing the bird.

---

**(continued…)**

> *told me to say I never saw an eagle at her facility if asked.* Over a year ago [Permittee] gave me a live barred owl to hold for her after she lost her permit. I continued to hold it until this date anticipating I would return it to [Permittee] when she got her permit back.

(R.R. at 521a) (emphasis added).

[10] Ex-husband Singler's signed, sworn affidavit stated in pertinent part:

> On an unknown date in September, 2012, I received a phone call from my ex-wife [Permittee]. During that call she told me that she had been visited by Conservation Officers within the past few days regarding a bald eagle she took in. [Permittee] told me two males had brought the injured eagle to her. She said she put it in a building on her property away from where her main facility was located…. *[Permittee] told me she had lied to the officers when she was questioned about the eagle.* She told them she didn't take in the eagle when it was brought to her by the two males and they just left it at the end of her driveway. *[Permittee] told me that she told the officers that she was intoxicated and on pills when this event took place, which was not true….*
>
> Stimer told me he was at [Permittee's] facility when the eagle was brought in. Stimer told me he saw the eagle and [Permittee] took it from the two men who found it. Stimer also told me he currently has a barred owl caged in his trailer that [Permittee] gave him when she lost her permits. Stimer said he's had it for a long time.

(*Id.* at 518a-519a) (emphasis added).

Permittee then testified that she was contacted by an individual claiming to be in possession of an injured bald eagle and that she advised the caller not to touch the bird and to call the Game Commission. She testified that she observed the bald eagle outside the Center but never touched or possessed it and denied that the bald eagle was ever inside the Center.

**B.**

WCO Brehun testified that in September 2013, as a result of the bald eagle investigation, he became aware that Permittee possessed a barred owl.[11] He

---

[11] WCO Brehun clarified that while gathering written statements from Ex-husband Singler and Volunteer Stimer with respect to the bald eagle investigation, it was revealed that Volunteer Stimer was in possession of a barred owl that he had received from Permittee. WCO Brehun testified as to the nature of his conversation with Ex-husband Singler:

\* \* \*

A. …Mr. Singler wanted to contact me because he had information regarding the bald eagle that was in question of being at Ms. O'Shell's facility. And he had discussed with a friend that was a worker, David Stimer, the next statement here, that he did see the bald eagle in the facility.

Q. Okay. And although we're going to get to that point a little bit later, his statement actually involves another migratory bird, as well, in question. Is that not accurate?

A. That is accurate.

Q. And what is the other animal in question?

A. It's a barred owl.

(*Id.* at 87a.)

10

explained that Volunteer Stimer reported receiving the barred owl from Permittee after she had lost her federal possession of migratory bird permits until she could receive her permits back.

Referring to photographs he took of the barred owl at Volunteer Stimer's residence, WCO Brehun stated that one picture "shows the very poor and sickening conditions of the talons as they began to twist and curl, which would have prohibited the animal to appropriate[ly] perch or feed, as it is," while another showed its overgrown beak, with respect to which licensed veterinarians opined that "this growth of the talons takes about a year at least, at minimum, to grow to that length." (R.R. at 95a.). He further testified that once she lost her federal permits, Permittee was to transfer the migratory bird species to properly licensed individuals outside of her possession and facility. He testified that it was also a violation under state law for her to be in possession or constructive possession of a bald eagle.

WCO Brehun testified that when the Game Commission learned of the barred owl, it relocated it to a properly licensed rehabilitator. He stated that veterinary results showed that, in addition to the problems with the barred owl's talons and beak, the owl was in chronic pain from prior amputation of one wing and the bird's breastbone was in poor nutritional state from not receiving proper food in the proper amount.[12] He testified that charges have not yet been filed

---

[12] WCO Brehun added that the barred owl is now healthy and is being used as an exhibit animal. It has received proper care and food and is on daily pain medicine.

against Permittee regarding her possession of the barred owl but that the investigation is ongoing.

Volunteer Stimer testified that Permittee gave him possession of the barred owl and told him to release the owl into the wild but he instead kept the bird captive, knowing that it was illegal. SA Cottrell also testified that Permittee violated the Migratory Bird Treaty Act by giving the barred owl to Volunteer Stimer.

## C.

Regarding the permit violation for unlawfully possessing a monk parakeet,[13] WCO Brehun stated that Permittee acquired the monk parakeet prior to adding it to the list of animals that she was allowed to keep.

Robyn Adachi (Volunteer Adachi), a Center volunteer and benefactor who was present when Permittee took possession of the monk parakeet, testified that Permittee was contacted in order to take custody of a number of birds from an elderly woman who was unable to care for them. She testified that she and Permittee took possession of several caged birds and transported them to the

---

[13] WCO Brehun explained that the monk parakeet species is of special concern "because it is unlawful for just anyone in this [C]ommonwealth to possess. Because if mis-cared for, mishandled and released, they could live and overtake native nesting grounds and populations of native species of birds in Pennsylvania." (R.R. at 104a.) He stated, however, that had Permittee applied for a permit prior to possessing the bird, she would have been legally allowed to keep and possess the bird because of her status as a Menagerie permit holder.

Center. Volunteer Adachi stated that she was unaware that a special permit was required to possess a monk parakeet.

Permittee also testified that she failed to identify all of the birds she recovered and was unaware of the special permit requirements for the monk parakeet. She stated that after having taken possession of the monk parakeet, she contacted the Game Commission and was issued a citation for her failure to obtain the required permits before taking possession.

## D.

Regarding the public exhibition of birds at the local Wal-Mart, WCO Brehun testified that when he arrived on the scene, animals were still out on display. He further testified that Permittee was unable to produce a copy of her Exhibit permit when requested.

Kylie Magargi (Volunteer Magargi), an individual who assisted Permittee with the display on the date in question, testified to displaying the permits that day. She stated that by the time WCO Brehun arrived on the scene, the exhibition was over and she returned to the Center with various donated supplies and other materials, including copies of the permits. She further testified that prior to WCO Brehun's arrival, the local Police Chief approached their tables and they were unable to produce the required permit.

Permittee testified that she possessed and displayed the required permits while exhibiting her wildlife at Wal-Mart. She testified that by the time

WCO Brehun arrived on the scene, the exhibit was already over, and that she and Volunteer Magargi were in the process of loading the vehicles to return to the Center. She explained that she had to go to her vehicle to retrieve her permits but that WCO Brehun refused to inspect them.

## E.

With regard to the conditions of the Center, WCO Brehun testified that Permittee was issued a notice of violation in February 2002 for unsanitary conditions at the Center under 58 Pa. Code §147.312.[14] He stated that on the date of his October 2014 inspection of the Center, not only did Permittee forget about the inspection, the Center was not in compliance:

\* \* \*

> A. …After stating that she had forgotten about the scheduled inspection, we still completed the inspection. And at that time, it was very upsetting at the same time to see the conditions in the areas that these animals were living in. Not only did some of them not have water, the ones that did have water, the bowls and containers had like a green scum or fecal contamination, which to a certain level is understandable, being that these animals would clean themselves or bathe themselves with it. But whenever you get green scum on the containers, that's from buildup over time.
>
> The fecal contamination, just from experience as a field officer not only with, you know, wildlife, but animals kept in these facilities, you can tell by the fecal contamination inside the pens laying amongst the food

---

[14] *See* 58 Pa. Code §147.312 ("It is unlawful for a person to accept, possess, transport or display wildlife contrary to this subchapter or the act.").

14

that was provided in some of the enclosures that there was some fresh, there was some old and there was some stuff in the enclosures that's been there for a really long time, because it was extremely dried out…

Q. Okay. And before we get to that, you had actually issued a notice of violation or, again, a warning to [Permittee] relative to that inspection. Is that accurate?

A. That is accurate.

\* \* \*

Q. Okay. And you've already identified, in general, that there was [sic] some unsanitary conditions, fecal contaminations. But there was [sic] other items other than the water as well that were out of compliance relative to the inspection. Can you recall what they were?

A. Yes. There are to be the signs on the outside of the premises before you'd enter any facility where the animals were located prohibiting any general public or anybody that's not to be in that area from feeding the wildlife. There were no signs depicting that. As well as each pen enclosure of any species needs to be identified with a depicted height[] of a letter depicting in English, what the identification of that species is.

Q. Okay. And did that occur in this particular instance, for either of those posting or signage requirements?

A. At the time of the original inspection, neither of those were [sic] present, prohibiting the public from feeding. Some of the enclosures did have the identification labels on, but not all of them did.

(R.R. at 116a-118a.)

15

WCO Brehun opined that Permittee's broad range of violations persisting over several years, including the illegal possession/transfer of various wildlife, the Center's deficient sanitation, the unlawful importation of species, and inadequate signage/record-keeping was sufficient to revoke Permittee's special permits.

Permittee testified that the animals' enclosures are cleaned daily and that proper signage is always posted as required. However, when shown certain photographs, she admitted that the fecal matter depicted had been present for longer than a day. She explained, however, that this fecal matter was not detrimental to the animals' health. She explained that the Center wrote protocols for the feeding, cleaning and caring for the animals. She further stated that because the primates, in particular, are sensitive to the noise generated by pressure washers and leaf blowers, those items were used sparingly. Permittee testified that she did not recall being issued a notice of violation for unsanitary conditions in 2002. She also denied that her advancing age or persistent health problems were a factor in her ability to manage the Center.

Regarding the notice of violation for the alleged failure to post the required signage, Lisa Mobley (Volunteer Mobley),[15] a Center volunteer, testified that she removed the signs in order to clean and forgot to replace them. She stated that she and another volunteer were in the process of cleaning when WCO Brehun

---

[15] Volunteer Mobley testified that her duties included caring for the animals and cleaning inside and around their enclosures.

16

arrived for the scheduled inspection. She also testified that primates produce the amount of feces WCO Brehun witnessed in one day's time.

Dr. Devonna Shoemaker, Professor of Biology at St. Francis University, testified generally about her efforts to create a Zoological Sciences program at the University, the program's affiliation with the Center, and Permittee's assistance.[16] She testified that she occasionally visited the Center and found the animals to be in clean conditions and that she was not concerned about the Center's conditions.

## III.

Finding that the Game Commission showed by a preponderance of the evidence that Permittee acted in a manner contrary to the intent of the special permits, the Hearing Officer recommended that the Game Commission recall and/or deny renewal of the Permittee's four special permits for a period of five years. In making this recommendation, the Hearing Officer found that the overwhelming evidence showed that Permittee unlawfully took possession of a bald eagle, two hedgehogs and a monk parakeet without first acquiring the appropriate permits.

Moreover, the Hearing Officer noted that Permittee's noncompliance extended to the unsanitary conditions at the Center, which was a problem since

---

[16] The Center's affiliation with the St. Francis University Zoological Sciences program began in 2011.

2002. He found that Permittee's conduct "ranged from inattentive and negligent, to willfully non-compliant and deceitful," and concluded that:

> [Permittee's] multiple, repeated violations over the course of several years seem to support the Commonwealth's contention that [Permittee], in many instances, consciously disregarded her responsibilities under the special permits. The evidence shows a clear and historic pattern of non-compliance. [Permittee's] conduct not only imperiled the health, safety, and welfare of the animals with which she was entrusted, but also infringed upon the public's expectation that wild animals held in captivity are housed and cared-for appropriately. Furthermore, [Permittee's] insolence towards the regulatory authorities, coupled with her unwillingness to accept responsibility for even one of a multitude of violations, casts serious doubt on the likelihood of material improvements occurring at the Center.

(*Id.* at 618a-619a.)

The Game Commission concurred with the Hearing Officer's recommendations and notified Permittee on June 18, 2015, that her four special permits were recalled for five years until June 17, 2020, after which she may reapply. This appeal followed.

## IV.

## A.

On appeal,[17] Permittee argues that the Game Commission erred in finding that she violated Section 929(a) of the Code, 34 Pa. C.S. §929(a), because the Commission failed to show that she was convicted of an offense under the Code or acted contrary to the intent of any of the permits that were recalled.

Permittee contends that because she was not convicted on the charges filed against her regarding the bald eagle since that charge was disposed of through the ARD program, those charges cannot be used to support the recall of her permits. While that may be so, there is substantial evidence to show that Permittee unlawfully took possession of a bald eagle, a threatened species at the time, without the required federal permit to possess migratory species. Although Permittee denied having possession of the bird, Volunteer Stimer testified to observing it inside the Center. SA Cottrell and Ex-husband Singler testified that Permittee admitted to possessing the bald eagle and to misleading investigators by denying that she had possession of the bald eagle.

There is also substantial evidence that Permittee unlawfully transferred possession of the one-winged barred owl to Volunteer Stimer after she lost her federal permit to possess migratory species. Volunteer Stimer testified that

---

[17] Our scope of review of the Game Commission's adjudication is limited to determining whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704; *Pfingstl v. Pennsylvania Game Commission*, 531 A.2d 821 (Pa. Cmwlth. 1987), *petition for allowance of appeal denied*, 542 A.2d 1373 (Pa. 1988).

19

Permittee transferred the owl to him, instructing him to release it into the wild. In so doing, not only did Permittee violate Section 2908(a)(1) of the Code, but she also put the disabled bird in the hands of an individual who did not have the proper permit to handle it.

Similarly, with regard to the monk parakeet and the hedgehogs, Permittee possessed the species without first acquiring the required permits. She claims she was not aware of the restricted status of the monk parakeet, but rather, asserts that she did not identify the monk parakeet as such when she took possession of it. Nonetheless, she was found guilty by a Magisterial District Judge for her unlawful possession of the monk parakeet, thereby violating Section 929(a) of the Code.

**B.**

Permittee next contends that the Game Commission erred in finding that she acted contrary to the intent of her permits by failing to possess her Exhibit permit while publicly exhibiting wildlife. Pursuant to Section 2908(a)(2) of the Code, it is unlawful for a permittee to fail to carry, show or display the required permit to an officer while exercising any privilege granted by the permit. 34 Pa. C.S. §2908(a)(2).

It is undisputed that Permittee was engaged in the public exhibition of wildlife at a Wal-Mart in Altoona in July 2014. Although Permittee claims that she had the Exhibit permit on hand and that WCO Brehun refused to inspect it, WCO Brehun testified that Permittee could not produce the permit when requested.

20

Her testimony was further contradicted by Volunteer Magargi who testified that she had already taken the permits back to the Center by the time WCO Brehun arrived on the scene because the exhibition was finished. Moreover, Volunteer Magargi testified that they could not produce the permit for the local Police Chief when he stopped by earlier. Despite Permittee's contentions that her permits were in her vehicle and that the exhibition was finished by the time WCO Brehun arrived on the scene, the record indicates otherwise. Permittee's failure to possess her Exhibit permit when she was engaged in public exhibition in front of the Wal-Mart violated Section 2908(a)(2) of the Code.

## C.

Finally, Permittee argues that the Game Commission erred in determining that she acted contrary to the intent of her permits by failing to maintain sanitary conditions and failing to display appropriate signs at the Center.

The Game Commission's regulations mandate that fecal and food waste must be removed from cages and dens daily and is required to be disposed of or stored in a manner so as to prevent noxious odors or attraction of insects or vermin. 58 Pa. Code §147.283. Moreover, signs must be conspicuously posted on cages or enclosures identifying the wildlife confined and prohibiting the public from feeding or annoying the wildlife. *Id.* §147.284. Failure to comply with one or more conditions of a permit may be cause for suspension, denial or recall of the permit. *Id.* §147.309.

21

During WCO Brehun's prearranged, annual inspection of the Center, he noted several deficiencies, including the Center's failure to provide clean and fresh water to the animals, failure to maintain sanitary conditions, and failure to display signs restricting public feeding. The issue of sanitation was not new and the Center had been issued notice of violations for its unsanitary conditions dating back to 2002. Permittee claims that the animals' enclosures were cleaned daily but contradictorily, she also admits to certain fecal matter being present longer than a day. Moreover, Volunteer Mobley acknowledged that she forgot to replace the signs after removing them for cleaning.

Accordingly, given Permittee's violations of numerous laws and regulations relating to her special permits, we affirm the Game Commission's decision to recall the special permits for a period of five years, as supported by substantial evidence.

_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Deborah E. O'Shell,           :
              Petitioner       :
                               :
           v.              : No. 1200 C.D. 2015
                               :
Pennsylvania Game Commission,    :
             Respondent      :

# **O R D E R**

AND NOW, this 21st day of March, 2016, the final order of the Pennsylvania Game Commission dated June 18, 2015, at No. S.C. 14-69, is affirmed.

_____
DAN PELLEGRINI, Senior Judge